IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| FRANCIE M. HOLLIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 12-00193-CG-N |
| TOWN OF MOUNT ) | |
| VERNON, et al. ) | |
| ) | |
| Defendants, ) | |

**ORDER**

This matter is before the Court on a motion for summary judgment filed by the defendants, Town of Mount Vernon, Jerry Lundy and Joseph Cassidy (the "defendants"). (Doc. 29.) The motion has been fully briefed (Docs. 30, 37 & 40), and the parties have submitted evidence in support of their respective positions. After considering the issues raised, the evidence presented, and the applicable law, the court finds that summary judgment is due to be **GRANTED IN PART** and **DENIED IN PART**, as set forth below.

**I. FACTUAL BACKGROUND**

Plaintiff Francie Michelle Hollis ("Hollis") was hired as a dispatcher for the Town of Mount Vernon ("the Town") in 2007. Hollis, Mount Vernon's only full-time dispatcher, also served as the supervisor for approximately ten part-time dispatchers. Mount Vernon Police Chief Richard Reed was Hollis' supervisor. During the time period relevant to Hollis' claims, however, Reed was on leave, and defendant Joseph Cassidy, a police lieutenant, was acting

police chief. Defendant Jerry Lundy was the Town's mayor during the relevant time period. William Cannon was a part-time dispatcher for the Town who worked the midnight to 8:00 a.m. shift.

Some time around early November 2009, Officer Chad Stempien, a Mount Vernon police officer, told Hollis that Cannon had been going to the police station on nights when he was not working and watching a female dispatcher, Tina Dillard, through the windows. Doc. 37-1 at 12. Hollis was also aware of an email Cannon had sent to Dillard, who is African American, "saying that he didn't know that he could love chocolate so much." Id. at 13. Hollis talked to Dillard about what Stempien had told her. Dillard was apparently unaware of Cannon's nocturnal visits and "said that it made her uncomfortable and that she didn't have any interest in him." Id. at 15. Hollis talked with Cannon, who said that he was just trying to be sure that Dillard was safe because the inmates are not locked down and walk around at night, but he promised not to do it any more. Id. Later in November, around Thanksgiving, Officer Stempien called Hollis and told her that Cannon was "still up here peeping through the window." Id. at 17. Stempien had confronted Cannon and threatened to arrest him if he caught him again. Id. Hollis also informed Lt. Cassidy, who was acting police chief, about the "peeping tom" incidents. Cassidy responded "[T]hat man is crazy. I don't know what to say about that man. You all better watch him." Id. at 18.

Hollis's talk with Cannon had unexpected consequences.  A few days later, Cannon started making advances toward Hollis.  Hollis described the first encounter as follows:

> He said he needed a strong-minded woman like me, would I like to go out with him.  And I said thanks, but no thanks.  I'm married.  And he said well, thank you.  I needed to hear that because I done fell in love with somebody like you .  I said well, don't love me because I've got a husband.

Id. at 42.  This conversation took place in the dispatch area as Cannon was going off duty and Hollis was coming on.  Lt. Cassidy witnessed this incident and, after Cannon left, said "I can't believe that fool just asked you out on a date."  Id.

Between November 11, 2009 and January 11, 2010, Cannon sent Hollis numerous emails or text messages of a personal nature.  The dispatchers used their personal email accounts and personal cell phones for work-related communications, so Cannon had Hollis's personal email address and cell phone number.  Cannon often emailed or text-messaged Hollis from work, just before shift change.  In these long, rambling emails and messages, Cannon acknowledged that Hollis was not interested in a relationship but nevertheless expressed his love for her and his hope that she would change her mind. Doc. 37-7 (Nov. 11, 2009 email).  He told her that he "look[ed] forward to seeing you on the days that you relieve me.  That's a fun day for me."  Id. (Dec. 4. 2009 email).  He told her that he wrote poetry for her and about her, that she was his "muse" even though she was not trying to be, and

3

that he was writing to her in a journal she kept in the file cabinet at work. Although he knew the journal was not his in which to write, he "could not help [him]self." Id.  In many of his written communications, Cannon acknowledged that Hollis did not share his feelings, that she did not respond to him, and that he did not know why he continued to woo her.  Doc. 37-7.

Around this time, Cannon also began frequently hanging out in the dispatch area during Hollis's shifts.  Hollis "couldn't do [her] job" because of Cannon being in the office all the time.  Doc. 37-1 at 26.  Hollis told him to leave but "[h]e never went anywhere."  Id. at 22.  Cannon would "stay in that dispatch office all day just rambling on little love poems."  Id. at 44.  Hollis went to Lt. Cassidy several times about Cannon not leaving the office. Cassidy promised to talk to Cannon but, to Hollis's knowledge, never did.  Id. Hollis went so far as to "call[ ] up to the RCA building in Montgomery and talked to Ms. Sherry and asked how many people were allowed to be in the dispatch people at one time."  Id.  Hollis learned that there is an "eight-minute grace people [sic] to do an exchange of information and then the person that was leaving had to be gone."  Id.  Hollis then "posted that, letting Lieutenant Cassidy know he [Cannon] can't be in here after his eight minutes is up, so you're gonna have to make him leave, but they didn't never do anything."  Id. at 22-23.

4

Cannon's hanging around also bothered Hollis for another reason. As Hollis described it: "[T]he guy was coming in there. No underwear, wearing these little bitty shorts, with his legs open." Id. at 26.

In mid-December 2009, Hollis had an appointment for a chemotherapy treatment at the Mitchell Cancer Center in Mobile, which is approximately 30 miles from Mount Vernon. She had not discussed this appointment with Cannon and certainly had not invited him to join her. While she was in the treatment area, she received a text message from Cannon telling her that he was in the waiting room. He said that he had come to be with her because he did not want her to go through treatment alone.[1] Hollis did not respond to Cannon, but she was convinced that Cannon was in the building because he described the waiting room to her. She immediately called the Mount Vernon dispatcher and asked her to call Cannon and tell him to leave or she was going to call the Mobile Police Department. Apparently, Cannon left.

Hollis also worked in city court on nights that the Town had court because Mount Vernon did not have enough officers to have a jailer in court. One night, just before Christmas 2009, Cannon volunteered to work court, too. When Hollis saw him there, she told Mayor Lundy, "would you please tell Cannon that you don't need him over here. . . . because [Cassidy]'s not going to do it, and all he's wanting to do is follow me around." Id. at 27-28.

---

[1] Hollis was not alone. Her husband had accompanied her to the appointment and was waiting outside.

5

Lundy responded: "I don't blame him baby. I'd like to follow you around, too. Look at you. Why wouldn't he want you[?]" Id. at 28.

The Mount Vernon Police Department written sexual harassment policy is set forth in Procedural General Order #16. Doc. 37-15. The policy states that the department "will encourage, support, and enforce the policy of a work environment free of sexual harassment" and defines harassment as "behavior that is personally offensive, impairs morale, and interferes with the work effectiveness of employees." Id. Examples provided include "unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct that is sexually offensive in nature." Id. Employees who believe they have been sexually harassed are instructed to "promptly report the incident to the Chief of Police or the EEO representative at the Mobile County Personnel Board." Id. The policy states that complaints "will be promptly and thoroughly investigated by the department." Id.

Hollis complained about Cannon's behavior to Cassidy, the acting police chief, several times. Doc. 37-1 at 45. When her complaints to Cassidy did not result in any relief, Hollis called Chief Steve Reed, who was on leave. She said that she "didn't want to be in there like that" with Cannon. Id. She told Reed that Lt. Cassidy had not done anything about the situation and that Reed "ha[d] to make [Cassidy] do his job." Reed told her he had no authority since he was on leave but promised to look into it. Id. at 59-60. Cassidy knew Hollis had talked to Chief Reed and came back "fussing at

6

[her]" for calling the chief.  Hollis told him to do his job and to "[g]et this man out of here."  Id.

Cassidy documented one of Hollis's complaints in a "Note[ ] to self" dated November 27, 2009.  Doc. 37-14.  The note states:

> Around 0630 pm I Lt. Cassidy was in conversation via cell phone call with Michelle Hollis regarding the inappropriate conduct on the part of Bill Cannon a Mount Vernon Police dispatcher his comments, she said were "not normal" especially towards Tina [Dillard] and then her [Hollis][.] [She said that she asked Nye to talk to him.  [Hollis] said it seemed like he was fixated on Tina and that she was mostly worried for her because he was going on and on about her, looking at her through the windows without her knowledge[.]  When Tina would not talk to him she said he turned his affection towards her [Hollis] nonstop.  I told [Hollis] that I was going to have to let Mr. Lundy know about this.  So I Lieutenant JD Cassidy contacted Mayor Jerry Lundy after hanging up with [Hollis][;] it was the day after Thanksgiving) to inform  him [of the situation].  [Hollis] said that Bill Cannon had been texting her cell phone asking her out to dinner and trying to get Tina Dillard (another female dispatcher who works for Mount Vernon Police Department)[.] [S]he said he first wanted to go out with Tina[.] [S]he told me that he said to her that he wanted to get naked with Tina and pour oil on him and Tina and have Tina to ride on top of him.  [Hollis] also told me that Bill said he would come to the station early in the morning between 1:00 am and 4:00 am and look through the blinds and watch her.  [Hollis] told me that Bill said he lives in the town and wanted to make sure that Tina was safe.  [Hollis] said it was really creepy when he turned his affections towards her calling her his dark eyed angel and putting it on facebook.  She said she asked officer Vincient [sic] Nye[,] also an employee[,] to talk to [Cannon] for her but she said [Cannon ] was insulted and began texting her and that he had texted her a total of 50  times in one day.  I talked to Mr. Lundy about this and I recommended that we might need to go ahead and get rid of Bill before we had a law suit on our hands.  Mr. Lundy said ok we'll discuss it further on Monday November 30, 2009 with Mr. Cannon.

Cassidy asked Hollis to give him a copy of the texts, and she told him that she would get them off her phone. When they finished talking, "at first [Hollis] was like "I will take care of it. I will take care of it." Doc. 37-4 at 3. But Cassidy said "No. . . . I am going to call Mr. Lundy and talk to him. . . . You let me handle it." Id.

Whether Cassidy or Mayor Lundy took action on Hollis's complaints is disputed. Cannon testified that neither of them ever talked to him about Ms. Hollis. Doc. 37-5 at 17. Cassidy, on the other hand, testified that he and Mayor Lundy confronted Cannon, and Cannon said he did not know he was frightening Hollis. Doc 37-4. at 4.[2]

Meanwhile, Cannon was causing other problems for the police department. On December 14, 2009, while working the midnight shift, he got into a confrontation with another officer, Officer Reed, shoved Officer Reed out of the dispatch office and closed the door on him. Cannon was upset about Reed's failure to deposit a bank bag at the bank. Doc. 37-4 at 7-8. The incident was reported to Lt. Cassidy. The following day Cassidy called Cannon into his office and asked Officer Nye to sit in on their meeting as a witness. Id. at 7-10. Cannon became upset during the meeting. Id. 8-9. He

---

[2] Hollis and Officer Vincent Nye did attempt to handle the situation. Nye and Hollis decided that Nye would tell Cannon that Nye and Hollis were together so that Cannon would leave Hollis alone. On or about November 26, 2009, Nye went to Cannon in the dispatch office and told him that he (Nye) and Hollis were a couple and asked him to leave her alone. A verbal altercation ensued, and Cannon summoned Lt. Cassidy to the office. In any event, Cannon's behavior toward Hollis did not change.

8

asked what he had to do to get someone to listen to him and began to crawl across the floor. Id. at 9. He then grabbed Officer Nye by the arms and shook him like a child. Id. Cassidy told him to "get your hands off that officer." Id. Nye then pushed Cannon off, took him down and restrained him on the ground. Id.

After this incident, Cassidy wanted to Cannon gone but was informed by the Town Clerk that he "couldn't officially . . . terminate him or suspend him" without going through the Personnel Board. Id. at 41. He could, however, take Cannon off the work schedule without involving the Personnel Board, and did so.[3] Cannon was temporarily removed from his job "[b]ecause of his anger and because he put his hands on an officer" and not because of his actions toward Hollis. Id. at 30-31.

In January 2010, it was apparent to Hollis that "Cannon wouldn't leave [her] alone." Doc. 37-1 at 40. Cassidy told her that Mayor Lundy was not going to fire Cannon and that the only thing she could do was to take it to the Town Council. Id. That night she went to the council meeting and stood up when the council announced it would take up new business. Cassidy, however, grabbed her shirt and pulled her down and said, "[W]e'll handle this

---

[3] In addition, Cannon was given a "Notice of Pre-Disciplinary Hearing" dated December 16, 2009. Doc. 37-11. The notice outlined the bank bag confrontation as well as the events that took place the following day in Lt. Cassidy's office and informed Cannon that a hearing was scheduled for December 29, 2009. According to a post-hearing notice from Mayor Lundy to Cannon, "no disciplinary action [was] taken." Doc. 37-12.

in the morning. Let's not do that and embarrass the town." Id. Hollis replied, "[I]f that man is sitting there in the morning when I come in here, I promise I'm not going to work here anymore. I'm tiring [sic] looking at his business." Id. at 96. Cassidy responded, "I know. I know. I'm going to take care of it in the morning." Cannon was still there the following day when Hollis came to work. After trying again to get Cassidy to take action, Hollis left her job and did not return. A few weeks after she left her job, Hollis brought copies of Cannon's emails and/or text messages to the Mount Vernon Police Department.

Ultimately, Cannon's employment was terminated. By letter dated March 29, 2010, Mayor Lundy explained the reasons for the decision. Doc. 37-10. First was Cannon's refusal while on duty to allow authorized personnel to retrieve a prisoner from the municipal jail. According to the letter, Cannon was "yelling, screaming and cursing" at the city employee and "became so irate" that Lt. Cassidy was called. Cassidy warned Cannon to modify his conduct and release the prisoner. The termination letter also cited Cannon's actions toward "a former Town employee" including "approximately ninety (90) emails . . . expressing inappropriate conduct about your feelings toward this employee" as well as "following her to the doctor's office." Id.

Hollis filed a timely charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and subsequently received a right-to-sue letter. This lawsuit followed.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied his responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact.  Id. "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." Clark, 929 F.2d at 608 (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).

### III. HOLLIS' CLAIMS FOR RELIEF

In her one-count complaint, Hollis asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and 42 U.S.C. § 1983 against the Town of Mount Vernon, Jerry Lundy, individually and in his official capacity, and against Joseph Cassidy, individually and in his official capacity. The precise nature of Hollis' claims against each defendant is difficult to discern due to the complaint's lack of specificity. Based on the complaint, the summary judgment motion and Hollis' response thereto, the court has distilled her claims as follows:

> (1) Title VII and § 1983 claim for sexual harassment/hostile work environment against the Town of Mount Vernon;
> (2) Title VII and § 1983 claim for sexual harassment/constructive discharge against the Town of Mount Vernon;
> (3) § 1983 claim for sexual harassment/hostile work environment against Jerry Lundy, in his individual capacity;
> (4) § 1983 claim for sexual harassment/constructive discharge against Jerry Lundy in his individual capacity;
> (5) § 1983 claim for sexual harassment/hostile work environment against Joseph Cassidy, in his individual capacity;
> (6) § 1983 claim for sexual harassment/constructive discharge against Jerry Lundy in his individual capacity.

Below, the court will address the claims against the § 1983 claims against all defendants before tackling the sexual harassment claims against the Town.

### IV. LEGAL ANALYSIS

#### A. § 1983 Claims

In addition to seeking summary judgment on the merits of Hollis' § 1983 claims, the defendants argue that these claims are barred by the statute

of limitations. The parties agree that Alabama's two-year statute of limitations applies to Hollis' § 1983 claims. See Powell v. Thomas, 643 F.3d 1300, 1303 (11th Cir. 2011) (all § 1983 actions brought in Alabama are subject to state's two-year personal injury statute of limitations). They also agree that the limitation period expired before this lawsuit was filed. Doc. 37 at 10. The only point of disagreement is whether the defendants have waived statute of limitations defense by failing to raise it in their answer.

Hollis points out that the statute of limitations "is an affirmative defense which must be specifically plead" under the requirements of Rule 8(c) of the Federal Rules of Civil Procedure. Id. Citing Day v. Liberty Nat'l Life Ins. Co., 122 F.3d 1012, 1015 (11th Cir. 1997), she argues that failure to plead the defense constitutes a waiver. Indeed, the Day court stated that "failure to plead the bar of the statute of limitations constitutes a waiver of the defense." Id.

On the other hand, the defendants point to various cases in which the Eleventh Circuit has allowed a defendant to raise a statute of limitations defense for the first time at, or even beyond, the summary judgment stage. E.g., Navarro v. Santos Furniture Custom Design, Inc., 372 Fed. Appx. 24 (11th Cir. 2010) (statute of limitations raised in motion for directed verdict); Steger v. General Elec. Co, 318 F.3d 1066 (11th Cir. 2003) (raised at pretrial conference); Grant v. Preferred Research, Inc., 855 F.2d 795, 797 (11th Cir. 1989) (raised in summary judgment motion). In contrast, the Grant court

13

demonstrated a much more relaxed approach toward the delayed assertion of a statute of limitations defense:

> The Supreme Court has held that the purpose of Rule 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it. Thus, if a plaintiff receives notice of an affirmative defense by some means other than pleadings, "the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice. When there is no prejudice, the trial court does not err by hearing evidence on the issue. Preferred raised the statute of limitations defense in a motion for summary judgment filed . . . approximately one month before trial. As a result, plaintiff was fully aware that the Preferred intended to rely on a statute of limitations defense. Further plaintiff does not assert any prejudice from the lateness of the pleadings. Under these circumstances, the district court correctly addressed the statute of limitations issue on the merits.

Grant, 855. F.2d at 797.

The apparent conflict between Day and Grant is merely a superficial one. In Day, the statute of limitations defense was raised for the first time in a Rule 59 motion after the conclusion of the trial. The plaintiff had no notice of defendant's reliance on the statute of limitations defense and, therefore, no opportunity to present evidence on the issue at trial. In the instant case, as in Grant and Steger, Hollis has been provided sufficient notice. Moreover, she has asserted no prejudice from the assertion of the defense at this stage of the proceedings. Therefore, the defense has not been waived. Because there is no dispute that Hollis filed this action more than two years after her cause of action accrued, the defendants are entitled to summary judgment on Hollis' 1983 claims against them.

## B. Hollis' Title VII Hostile Work Environment & Constructive Discharge Claims Against the Town

Sexual harassment is a form of sex-based discrimination prohibited by Title VII.  See, e.g., Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986) (forcing employee to work in sexually hostile work environment constitutes Title VII violation).  In two related decisions -- Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)--the Supreme Court clarified the two types of sexual harassment actionable under Title VII.  First, when an employee suffers a tangible employment action as a result of the employee's refusal to submit to a supervisor's sexual demands, such conduct amounts to sexual discrimination.  Ellerth, 524 U.S. at 753.  Second, if no tangible employment action has occurred, then the conduct violates Title VII only if it was so severe or pervasive as to alter the terms and conditions of employment, i.e., a hostile work environment.  Faragher, 524 U.S. at 786; see also Walton v. Johnson & Johnson Serv., Inc., 347 F.3d 1272, 1279 (11th Cir. 2003).

To succeed on her hostile work environment claim (which is also the foundation for her constructive discharge claim), Hollis must prove the following elements:

> (1) that … she belongs to a protected group; (2) that [she] has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment [was] based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and

15

create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808 (11th Cir. 2010) (en banc). The Town disputes Hollis' ability to prove the last two elements and also challenges Hollis' ability to prove constructive discharge.

### Whether Severe or Pervasive Harassment Affected Terms & Conditions of Hollis' Employment

"Either severity or pervasiveness is sufficient to establish a violation of Title VII. Id. In determining whether harassment was severe or pervasive, the Court must view the evidence "cumulatively" and consider the "totality of the circumstances." Id. at 807-808. "In evaluating allegedly discriminatory conduct, we consider its 'frequency ...; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. at 808-09 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). Furthermore, "the plaintiff must prove that the environment was both subjectively and objectively hostile." Id. at 809.

The Town's argument is twofold. First, it argues that the harassment did not affect the terms and conditions of Hollis' employment because "Plaintiff has presented no evidence that any of the alleged harassment [by Cannon] was work-related or took place in public while the Plaintiff was on duty." Doc. 30 at 13. This argument simply ignores the evidence. Cannon professed his love for Hollis while they were at work. He asked her out on a

date in Cassidy's presence.  He sent her emails and text messages while he was on duty.  He refused to leave the dispatcher's office when his shift ended and would remain in the office for hours while Hollis worked.  On more than one occasion he was caught spying on a female dispatcher who was working the night shift.  Hollis has, therefore, presented evidence that the harassment affected a term or condition of her employment.

The Town further argues that the conduct complained of was not severe or pervasive. However, the evidence -- viewed cumulatively, in context, and in the light most favorable to Hollis -- presents an atmosphere of pervasive sexual harassment.  Over the course of two months, Hollis was inundated with unwanted attention of a sexual nature from Cannon.  Cannon had previously showered his attention on another female employee and, when told to leave her alone, he focused on Hollis.  Cannon was a "peeping tom," and a persistent pest.  He would not take no for an answer.  He sat in Hollis' office wearing short shorts and no underwear and recited love poems to her.  He was, in a word, creepy.  He was so creepy, in fact, that he showed up her doctor's appointment.   In addition to working with Cannon, Hollis worked for a town whose Mayor told her he would also like to follow her around, who called her baby and who invited her to come home with him.  Based on this evidence a factfinder could conclude that the harassment was sufficiently severe or pervasive to alter the terms and conditions of Hollis' employment.

17

**Constructive Discharge**

When, as here, a plaintiff has resigned from her employment because of the hostile work environment, and asserts an additional claim for constructive discharge, the issue is whether "working conditions [were] so intolerable that a reasonable person would have felt compelled to resign." Pa. State Police v. Suders, 542 U.S. 129, 147 (2004). The Town argues that Hollis cannot succeed on this claim because "the actions taken by Cannon . . . all took place outside of the work environment" and because "there was no notice to the Town that these events either took place or continued to take place." Doc. 30, at 15. As discussed above, there is evidence that most of Cannon's conduct took place at work. And, as discussed below, there is evidence that the Town had notice and failed to take prompt remedial action.

**Employer Liability**

An employer may be held liable for hostile work environment sexual harassment under three possible theories:

> First, when a supervisor with immediate or successively higher authority over the employee engages in harassment that includes an adverse employment action, the employer is held strictly liable. Second, when such a supervisor engages in harassment that does not include an adverse employment action, the employer is held vicariously liable unless it is able to prove the "*Faragher/Ellerth* affirmative defense," . . . Finally, when the perpetrator of the harassment is a coworker rather than a supervisor, the employer is only held vicariously liable if it had actual knowledge of the harassment, or constructive knowledge due to the severity and pervasiveness of the harassment, and failed to take prompt remedial action.

Quick v. City of Birmingham, 346 Fed. Appx. 494, 496 (11th Cir. 2009) (footnote and internal citations omitted).  Although the parties assume that the Faragher/Ellerth affirmative defense applies, this case actually falls into the third category.  Because the harassment was perpetrated by a coworker, Hollis bears the burden of proving that the Town actually knew of the harassment or that Cannon's conduct was so severe and pervasive that it should have known and that the Town failed to take prompt remedial action. See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1278 (11th Cir. 2002) (addressing employer liability for coworker hostile work environment/sexual harassment).

In this case, there is evidence that the Town had actual knowledge and failed to take prompt remedial action.  "Actual notice is established by proof that management knew of the harassment." Id.  Hollis presented evidence that she complained to her supervisor, Acting Police Chief Joseph Cassidy, about Cannon's behavior toward her and that she did so on more than one occasion.  The Town ostensibly disciplined Cannon by taking him off the work schedule for several days, but that action had nothing to do with his harassment of Hollis.  In any event, it did not remedy the problem. In January 2010, approximately two months after the problems began, Hollis made clear to Cassidy that the conduct was intolerable and that she could not work with Cannon.  Still, no remedial action was taken, and Hollis resigned.

Based on this evidence, a factfinder could conclude that the Town is liable for the hostile work environment.

## V. CONCLUSION

For the reasons discussed above, the Court finds that the defendants are entitled to summary judgment as to all claims asserted under 42 U.S.C. § 1983 because those claims are barred by the statute of limitations. Therefore, the motion for summary judgment is **GRANTED IN PART**, with respect to those claims.  However, Hollis has presented sufficient evidence to withstand summary judgment with respect to her Title VII sexual harassment/hostile work environment claim against the Town of Mount Vernon, and the motion for summary judgment is **DENIED IN PART** as to that claim.

**DONE** and **ORDERED** this 26th day of July, 2013.

/s/ Callie V.S. Granade
**UNITED STATES DISTRICT JUDGE**